**IRONTON FIRE BRICK COMPANY, Appellant,**

**v.**

**Ford BURCHETT and Maurice Bays, d/b/a Burchett and Bays, Appellees.**

Court of Appeals of Kentucky.

March 9, 1956.

---

Thomas D. Theobald, Jr., Grayson, for appellant.

W. H. Counts, Counts & Counts, Olive Hill, for appellee.

STEWART, Judge.

Appellant, Ironton Fire Brick Company, is an Ohio corporation engaged in the manufacture of fire brick with its plant located at Ironton, Ohio. It has clay holdings and leases in Carter County from whence raw clay is shipped to its plant in Ohio to be processed into the finished product. James B. Adams is the mine superintendent and the highest official of appellant in Kentucky, and he has held this position for thirty-two years. It is not in dispute that Adams during his period of employment by appellant has secured leases and made contracts on behalf of appellant for the stripping and delivery of clay to the latter. Appellees, Ford Burchett and Maurice Bays, have worked for many years as partners in Carter County and near by in stripping, hauling and loading clay.

According to appellees' testimony, Adams sent for them in May of 1952 and when they met with him he told them appellant would buy 5,000 tons of clay at $4.35 per ton. The agreement arrived at, both stated, was that they were to exhaust a lease of appellant's in Carter County, known as the "Webb tract," then clay could be taken from any property where it could be found, and all clay was to be delivered to Soldier, Ky., at which place it was to be loaded on railroad cars for shipment.

Appellees subsequently employed the Hatfield Construction Company as sub-contractors to carry out the contract, agreeing to pay them $3 per ton for stripping, hauling and loading the clay for shipment. After the work had begun one Homer Owens, an employee of appellant, brought appellees a written document from appellant which called for only 1,000 tons of clay at $4.35 per ton to be stripped and delivered. Appellees refused to sign this document because it specified 1,000 tons instead of 5,000 tons, which latter tonnage they claimed was the quantity of clay involved in their agreement with appellant, and the document was also objectionable for the reason that it made them responsible for the damage done to any property they exploited for clay.

They testified they promptly took the alleged contract, unsigned, to Adams, complained that it was 4,000 tons short of their agreement with appellant, and that Adams directed them "to go ahead on the 5,000 tons" basis. Appellees continued operations under such an arrangement until some 1,190.95 tons of clay were delivered to and accepted by appellant. At this juncture they were told to stop stripping and loading clay for a period of two or three weeks on account of a steel strike, since appellant's business was directly dependent upon the steel industry. Appellees, however, continued working until 1,500 to 2,500 tons of clay were stripped and made ready for shipping, but no further loading orders were received from appellant after the notice to cease operations. Adams was present and saw them perform the additional labor without comment. The refusal of appellant

to accept the difference between the 5,000 tons of clay appellees assert the contract specified and the 1,190.95 tons they delivered gave rise to the present suit.

Adams in his testimony denied agreeing to the 5,000-ton provision in the contract; on the contrary, he maintained he told appellees the contract was for only 1,000 tons of clay to be stripped and delivered and he further insisted he had no express authority to contract for clay shipments since such an agreement must originate with appellant. Jim Murphy, a representative of the Hatfield Construction Company, the sub-contractors with whom appellees entered into an agreement to sublet their contract with appellant, testified Adams informed appellees in his presence that the contract was for only 1,000 tons of clay, although he was under the impression later on, after talking with appellee, Burchett, that he was to mine 5,000 tons of clay. Clifford Price, appellant's clay inspector, testified he distinctly remembered hearing Adams tell appellees he was empowered to enter into only a 1,000-ton contract. James B. Skirvin, vice-president of appellant, testified he had never acquainted appellees with the extent of Adams' authority.

The trial court, sitting without a jury, tried the case and adjudged that Adams had legal authority to enter into the 5,000-ton contract with appellees, that the contract consummated called for this tonnage to be stripped and delivered, and that appellant must either accept the additional quantity of clay stripped and made ready for loading by appellees and their agent, Hatfield Construction Company, at the contract price of $4.35 per ton or that appellees shall have the right to remove it and sell it elsewhere, paying to appellant the fifteen cents royalty per ton which appellant is obligated to pay the land owner.

On this appeal from the judgment recited, these grounds are asserted for reversal: (1) Adams had no authority to buy clay or to bind his employer to any contract; and (2) the evidence conclusively shows the contract was for only 1,000 tons of clay. We shall consider each contention in the order named.

It will be recalled that appellant is an Ohio corporation with its manufacturing plant at Ironton, Ohio. It has clay leases and mines in Kentucky, and James B. Adams has been its general manager in this state for some thirty-two years. Not only has this employee supervised the mining operations on appellant's holdings in the area mentioned but, from his own testimony, he has secured leases and entered into agreements for the stripping and delivery of clay on behalf of appellant, fixing the quantity to be bought and the price to be paid by appellant. Appellees emphasized Adams' authority in respect to such contracts had never been questioned prior to the instant litigation.

■ 13 Am.Jur., Corporations, Sec. 916, p. 890, discusses the powers of a general resident manager of a foreign mining corporation, and it lays down the rule that such a manager has the implied or apparent authority to execute contracts in the corporation's behalf within the scope of its ordinary business. We believe this language from the above section controls the facts presented by this appeal in respect to Adams' contractual powers:

"Persons dealing with the general resident manager of a foreign mining company who is engaged in carrying on its business have a right to assume, in the absence of notice, that the manager's authority extends to all usual dealings necessary in the business, such as procuring necessary supplies or ordinary implements for the work, and that he has a right to pledge the credit of the corporation for the payment of debts contracted for these purposes."

See also Hall-Watson Furniture Co. v. Cumberland Tel. Co., 203 Ky. 90, 261 S.W. 883, and Star Mills v. Bailey, 140 Ky. 194, 130 S.W. 1077.

While the testimony is in conflict as to whether the contract called for the stripping and delivery of 1,000 tons or 5,000 tons of clay by appellees, we conclude there is no doubt but that Adams had apparent, if not actual, authority to negotiate and consummate a contract in behalf of appellant for 5,000 tons of clay to be mined and shipped to the latter. It was established Adams has been held out for thirty-two years as the chief agent and highest official of appellant in Kentucky with full power to contract for appellant in respect to mining clay and delivering the same to it and, in the face of these facts, we believe the first ground urged for reversal is untenable.

As has been stated, the evidence was in conflict as to the number of tons of clay the contract in controversy embraced. Furthermore, there was a dispute as to whether appellees knew the claimed power delegated to Adams was restricted to the execution of an agreement calling for acceptance of the smaller tonnage. The trial judge, without the intervention of a jury, found against appellant's contention that the contract was confined to only 1,000 tons of clay and that Adams communicated to appellees his inability to enter into a 5,000-ton contract. CR 52.01 provides, so far as pertinent here: "* * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. * * *" The trial judge saw and heard the witnesses testify, he observed their demeanor on the witness stand, and he was of the opinion that appellant, through its authorized agent, Adams, contracted for 5,000 tons of clay to be stripped and delivered to it. Applying CR 52.01 to the findings of fact, it is our view the judgment should not be disturbed.

Wherefore, the judgment is affirmed.